Darren H. Lubetzky
Savvas S. Diacosavvas
Karen Dahlberg
Federal Trade Commission
Northeast Region
One Bowling Green, Suite 318
New York, NY 10004
Tel: (212) 607-2808  (Lubetzky)
Tel: (212) 607-2809  (Diacosavvas)
Tel: (212) 607-2821 (Dahlberg)
Facsimile: (212) 607-2822
dlubetzky@ftc.gov
sdiacosavvas@ftc.gov
kdahlberg@ftc.gov

Attorneys for Plaintiff
Federal Trade Commission

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>    Plaintiff,<br><br>    v.<br><br>THRIVE LEARNING, LLC, also doing business as BUSINESS EDUCATION DEPARTMENT, FOCUS, LIGHTWAVE WEB BUILDER, and THRIVE LEARNING INSTITUTE, a Utah limited liability company,<br><br>MATTHEW RASMUSSEN, individually and as a manager and an owner of THRIVE LEARNING, LLC, and<br><br>DAVID RASMUSSEN, individually and as a manager and an owner of THRIVE LEARNING, LLC,<br><br>    Defendants. | Case No. 2:17-cv-00529-DN<br><br><br>**COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF** |

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1.      The FTC brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), and the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, to obtain permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Sections 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the FTC's trade regulation rule entitled Telemarketing Sales Rule ("TSR" or "Rule"), 16 C.F.R. Part 310.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a), 53(b), 6102(c), and 6105(b).

3.      Venue is proper in this district under 28 U.S.C. § 1391(b) and (c), and 15 U.S.C. § 53(b).

## PLAINTIFF

4.      The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the Telemarketing Act. Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices.

5.      The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and the Telemarketing Act, and to secure such

2

equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. §§ 53(b), 56(a)(2)(A)-(B), and 6105(b).

## DEFENDANTS

6.      Defendant Thrive Learning, LLC ("Thrive"), also doing business as Business Education Department, Focus, Lightwave Web Builder, and Thrive Learning Institute, is a closely held Utah limited liability company with its principal place of business at 512 West 800 North, Orem, Utah 84057.  In August 2013, Thrive sold its assets to Lift International, LLC, and in 2014, Thrive filed Articles of Dissolution.  Thrive has transacted business in this district and throughout the United States.

7.      Defendant Matthew Rasmussen is a resident of Orem, Utah.  He was an owner and a managing member of Thrive.  Until at least August 2013, acting alone or in concert with others, he formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.  Defendant Matthew Rasmussen, in connection with the matters alleged herein, transacted business in this district and throughout the United States.

8.      Defendant David Rasmussen is a resident of Orem, Utah.  He was an owner and a managing member of Thrive.  Until at least August 2013, acting alone or in concert with others, he formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.  Defendant David Rasmussen, in connection with the matters alleged herein, transacted business in this district and throughout the United States.

## COMMERCE

9.      At all times material to this Complaint, Defendants have maintained a substantial

course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITY

### Overview of the Deceptive Telemarketing Scheme

10.     From approximately March 2008 to August 2013, Thrive sold purported personalized business coaching services and related products and services (the "Business Coaching Program") to consumers trying to start a home-based Internet business.  Thrive marketed its products and services through telemarketing calls.

11.     Thrive engaged numerous telemarketing sales floors ("Sales Floors") to market and sell the Business Coaching Program.   The Sales Floors used a variety of deceptive sales tactics described herein to induce consumers to purchase the Business Coaching Program. Consumers typically paid thousands of dollars – most of it charged on their credit cards – for the Business Coaching Program based on false promises that these services would enable consumers to start their own successful Internet business.

12.     Thrive sold the Sales Floors "leads" (contact information for potential customers to call) and then provided the coaching and related services sold by the Sales Floors.  The Sales Floors split the sale proceeds with Thrive.

13.     The Sales Floors typically did not disclose to consumers that Thrive provided the actual coaching services they were selling.  When communicating to consumers while providing the coaching services, Thrive employees typically represented that they were associated with the Sales Floor or used a generic brand name like "Focus" or "Mentor Group."  Thus, consumers

typically were not even aware that Thrive provided the purported coaching services they purchased.

14.     After consumers purchased the Business Coaching Program, Thrive continued to target them for additional telemarketing calls designed to induce additional sales. During these upsells, Thrive offered to sell consumers a host of additional products and services through other telemarketing entities they engaged, including entity setup, drop shipping, and marketing services.

15.     Most consumers who purchased services from Thrive did not develop a successful online business as promised, earned little or no money, and ended up heavily in debt. Thousands of consumers have lost millions as a result of this deceptive telemarketing scheme.

### Thrive's Business Practices

16.     Thrive began operating in 2008. Matthew Rasmussen and David Rasmussen were the principal owners of Thrive and helped formulate its sales practices. Each one was a signatory on multiple bank accounts and merchant accounts used by Thrive.

17.     Thrive entered into agreements with Sales Floors to sell its Business Coaching Program, which included its coaching services and related "add-on" products and services. These "add-on" products and services included a monthly membership to access online materials and webinars as well as various eBay and website software packages.

18.     Thrive provided the Sales Floors with marketing materials that described the Business Coaching Program to include individualized training from "experienced instructors" with access to a "curriculum" consisting of online video tutorials and webinars about eBay, affiliate marketing, dropshipping, and building a website.

19.     Thrive also provided the Sales Floors with testimonials of people purportedly having success and making money from the Business Coaching Program. The Sales Floors placed these testimonials on their own websites and referred to these success stories in their sales calls.

20.     In addition, Thrive provided the Sales Floors with retail prices that the Sales Floors were to charge consumers for different coaching services and "add on" products as part of the Business Coaching Program. The variety of products and services available enabled the Sales Floors to assemble packages at a wide range of price points, and in turn, charge consumers varying amounts based on what available credit or savings the consumer had, ranging from several thousand dollars to over ten thousand dollars, to participate in the Business Coaching Program.

21.     Thrive priced its coaching based on the number of weeks of service. For example, in 2013, Thrive provided coaching packages with retail prices that ranged from a 4-week package for $1,600 to a 20-week package for $8,000. The wholesale price was 10%, which in this example meant that the Sales Floor paid Thrive $40 for each week of coaching. Thus, the Sales Floors charged consumers $8,000 for a 20-week coaching program and paid Thrive $800 to provide the coaching services for the Business Coaching Program.

22.     Thrive also sold customer leads to the Sales Floors. Thrive purchased the leads from entities that marketed work-at-home or online business opportunities over the Internet. Many of these lead generators touted a purportedly lucrative work-at-home program that usually cost $97 dollars or less.

23.     Among the online offers that generated leads that Thrive purchased and then resold to the Sales Floors included ones marketed under brand names "Mobile Money Code" and "Coffee Shop Millionaire," which have been the subject of thousands of consumer complaints.

24.     The Sales Floors then made outbound calls to consumers identified as leads to sell Thrive's business coaching services for thousands of dollars.  Once consumers purchased the Business Coaching Program, Thrive sent consumers emails that included representations that consumers would receive personalized advanced training that would enable them to build a successful online business.

25.     For example, since at least 2010, Thrive sent consumers a "Welcome Call" email from a generic email address, scheduling@coachwebmail.com, that touted "we will provide you with access to the most advanced training and tools to aid your success," followed by instructions on how to access its "exclusive Elibrary," and then stating "we look forward to work hand in hand in building your successful online business."

26.     While the consumers were enrolled in the Business Coaching Program, Thrive provided their customer contact information to other telemarketers to call these consumers to "upsell" additional products and services.  These "upsell" telemarketers usually charged consumers thousands of dollars more and remitted a portion of their sales back to Thrive and the Sales Floors.  Thrive received up to 35% or 40% of the amounts charged to the consumers.

27.     Thrive coordinated the upsells.  For example, Thrive typically arranged for telemarketers selling entity setup services, business planning, bookkeeping, tax planning, and other similar services to call the consumers during the third week of the coaching program.

These calls were usually the first upsell attempt to consumers who had purchased business coaching services from Thrive.

28.     Thrive continued to target consumers with more upsells later in its coaching program.  For example, after the initial upsell at three weeks into the program, Thrive typically arranged for telemarketers to call consumers again in order to sell website building packages and marketing services.

29.     Thrive knew that the telemarketers with whom Thrive shared consumers' contact information and received a portion of the sale proceeds repeatedly charged these consumers thousands of dollars for various upsell packages after they enrolled in the Business Coaching Program.

30.     In addition, in numerous instances, Thrive and the Sales Floors required consumers to agree to remove any negative comments or complaints they published online or reported to the Better Business Bureau in order to receive a refund.

### Thrive's Merchanting Relationship with the Sales Floors

31.     During at least 2011 to 2013, Thrive also provided several Sales Floors access to several merchant accounts it set up under generic brand names like "Business Coaching" and "Business Education Department" in order to process telemarketing sales transactions initiated by the Sales Floors.

### The Merchant Account Process

32.     A "merchant account" is a type of account that allows businesses to process consumer purchases by credit or debit card.  Merchant accounts are available through financial institutions called "member acquiring banks" or "acquirers."  Without access to a merchant

acquiring bank, which is a member of one or more of the credit card associations such as MasterCard and VISA, merchants are not able to accept consumer credit or debit card payments.

33.     Merchant acquiring banks frequently enter into contracts with entities known as "payment processors" that manage the bank's merchant processing program.  Before a payment processor will establish a merchant account, the merchant has to meet the bank and processor's underwriting criteria.  Some companies are denied merchant accounts because the payment processor concludes that the company applying for the merchant account is too much of a risk.

34.     Consumers have the ability to dispute charges that appear on their credit card bills by initiating what is known as a "chargeback" with their issuing bank.  The chargeback process is intended to protect consumers from fraud and unauthorized charges on their credit card bills.

35.     Credit card associations – such as VISA and MasterCard – have rules regarding their chargeback process.  Those rules provide that when a consumer disputes a charge through the chargeback process, the consumer's issuing bank provisionally credits the consumer's credit card for the amount of the disputed charge.  The customer's dispute is then relayed to the merchant, which in turn, may challenge the attempted chargeback by arguing that the charge was, in fact, valid.  If the merchant challenges the attempted chargeback, the credit card association rules govern the manner in which the dispute is resolved.  If the merchant is successful in disputing the chargeback, then the issuing bank reverses any provisional credit issued to the consumer, and the consumer becomes financially responsible for the disputed charge.  If the consumer prevails and the chargeback is sustained, then the disputed charge is removed from the consumer's account permanently or an offsetting credit is issued, and the

charge amount is recouped from the merchant.  A chargeback rate greater than 1% is considered excessive by the credit card associations.

36.     To assist in the process of underwriting merchant accounts, the credit card associations have created programs to track merchants and individuals that previously have had merchant accounts terminated by merchant acquiring banks for, among other things, excessive chargebacks.  MasterCard, for example, maintains the Member Alert to Control High-Risk Merchants ("MATCH") list.  This list includes merchants (and principals) whose merchant accounts were terminated by merchant acquiring banks for certain reasons, including fraud, excessive chargebacks, or other violations of the credit card association's operating rules.

### Thrive Provided the Sales Floors Access to Its Merchant Accounts

37.     Thrive made available its merchant accounts to several Sales Floors in exchange for a fee, typically 10% of the total sales initiated by the Sales Floors that were processed through one of Thrive's merchant accounts.

38.     Among the Sales Floors that entered these merchanting arrangements with Thrive was (i) one floor that operated in Las Vegas, Nevada under the names Global Education, Inc. and Education Mentoring Group, and (ii) another floor that operated in St. George, Utah under the name Successful Education Online, LLC, whose principal had previously been placed on the MATCH list for excessive chargebacks.

39.     As a result of this merchanting arrangement, Thrive received notices about numerous chargeback requests from dissatisfied consumers who disputed payments for coaching services processed through Thrive's merchant accounts.

40.     Thrive's merchant accounts used to process sales initiated by its Sales Floors had excessive chargeback rates indicative of deceptive or fraudulent sales practices.  For example, one Thrive merchant account opened under the DBA name "FCS Education" had a year-to-date chargeback rate of 10% as of May 2012.  Another Thrive merchant account opened under the DBA name "Business Coaching" had a chargeback rate over 8% for all 2012 transactions.

41.     Thrive was aware of the chargeback rates and also worked with the Sales Floors to dispute the chargebacks.

### Deceptive Sales Practices

42.     Thrive engaged multiple Sales Floors to initiate telephone calls to consumers throughout the United States to induce sales of the Business Coaching Program.

43.     The Sales Floors typically operated under various DBA names.

44.     The Sales Floors engaged by Thrive to sell the Business Coaching Program made a number of misrepresentations outlined below to generate sales.

45.     Many of the Sales Floors used similar recycled scripts that guided sales representatives during the telemarketing calls when selling the Business Coaching Program.

46.     The Sales Floors' sales pitch typically lasted for more than an hour over the course of one or more telemarketing calls.  In numerous instances, the initial call was designed for the Sales Floors' representatives to "probe" consumers' personal financial information and personal goals or hardships ("pains") under the guise of a qualification screening process.

47.     Once consumers provided their personal information, they were typically then transferred to, or called later, by different sales representatives who tried to "close" the sale. During the "close," the sales representatives typically told consumers what the cost was to

"invest" in the Business Coaching Program, which varied greatly depending in part on the consumer's personal finances.  The sales representatives typically encouraged the consumers to use their personal credit cards to pay for the program as part of a so-called "OPM" strategy, specifically, using Other People's Money (e.g., the bank's money).

48.     In numerous instances, the sales representatives claimed that the Business Coaching Program was open only to select applicants who qualified to participate.  The sales representatives also appealed to the consumer's expressed goals, hardships, and "pains" to pressure the consumer into purchasing the Business Coaching Program.

### Misrepresentations about the Purpose of the Call, the Nature of the Program, and The Need for Consumers' Personal Financial Information

49.     In numerous instances, the Sales Floors started their sales calls by claiming they were calling as part of the work-at-home product or service that the consumers previously purchased from the lead source and did not promptly and clearly identify themselves or disclose that the purpose of the calls was to sell another product or service.

50.     Later, the Sales Floors' representatives told the consumers that they were calling to screen candidates for an exclusive program in which qualifying participants would get specialized assistance from an expert coach.

51.     In numerous instances, the Sales Floors' representatives told consumers that the Business Coaching Program had limited spots, was not available to everyone, and/or that only qualified people could be accepted into the program.

52.     The Sales Floors' representations about the limited availability of the Business Coaching Program were false because there were no limits on how many sales of the Business

Coaching Program the Sales Floors could make and there were no qualifications for entry into the program other than the consumer's willingness to pay whatever the Sales Floors charged.

53.     As part of the purported screening process, the Sales Floors' representatives asked consumers about their financial circumstances, including income, savings, debts, and credit card balances and limits.  The Sales Floors' representatives claimed they needed this information to determine whether the consumer qualified for a program and/or to develop a business plan for the consumer to reach his or her goals.

54.     The Sales Floors' representations about the use of consumers' financial information were false because the Sales Floors did not use the information to assess a consumer's qualifications or develop a business plan.  Instead, in numerous instances, the Sales Floors used this information to decide how much to charge consumers for the Business Coaching Program.

### Misrepresentations about the Scope and Nature of Products and Services Provided

55.     In numerous instances, the Sales Floors' representatives told consumers that if they purchased the Business Coaching Program, they would receive: (a) specialized one-on-one expert training tailored to the consumers' specific needs or business; (b) access to specialized market research to find profitable products they could sell on eBay or on their own ecommerce websites; (c) specialized assistance to develop ecommerce websites that were highly ranked by search engines; or (d) marketing techniques that would drive consumers to their ecommerce websites.

56.     The Sales Floors' representations about the scope and nature of products and services provided were false.

57.     In numerous instances, purchasers did not receive specialized expert training or access to any specialized market research.  Instead, in numerous instances, the only training that consumers received in the Business Coaching Program consisted of basic information available for free online, such as how to open an account on eBay or Paypal.

58.     In numerous instances, purchasers did not end up with ecommerce websites that are highly ranked by search engines or that generate substantial consumer traffic.

### Misrepresentations about Earnings

59.     In numerous instances, the Sales Floors encouraged consumers to purchase the Business Coaching Program by representing that consumers were likely to earn substantial income from the Business Coaching Program.

60.     The Sales Floors' earnings representations, which took many forms, left consumers with the impression they would be able to recoup the cost of their purchase and earn several thousand dollars a month from the Business Coaching Program.

61.     For example, in numerous instances, the Sales Floors' representatives told consumers that within a number of months, they could earn several thousand dollars a month from the Business Coaching Program.

62.     In numerous instances, the Sales Floors' representatives encouraged consumers to charge the cost of the Business Coaching Program on their personal credit cards.  The Sales Floors' representatives often told consumers they would not actually be paying the charges out of their own pocket because they would make enough money from their future businesses to pay the balance plus have money left over as profit.

14

63.     In numerous instances, the Sales Floors' representatives asked consumers about their financial goals and how much they wanted to earn from their future business.  In numerous instances, the Sales Floors' representatives told consumers that their stated financial goals of several thousand dollars a month were attainable if they participated in the Business Coaching Program.  The Sales Floors' representatives also told consumers that the cost of the Business Coaching Program (which varied widely but was typically at least several thousand dollars) was an appropriate investment for their stated financial goals.

64.     In numerous instances, the Sales Floors' representatives also told consumers that if they were willing to devote just ten hours (or less) a week on the Business Coaching Program, they would be successful.

65.     In numerous instances, the Sales Floors' representatives also told consumers that other participants in the Business Coaching Program became "success stories" and/or referred to testimonials provided by Thrive that purported to be from consumers who made money through the Business Coaching Program.

66.     In numerous instances, the Sales Floors' representatives also told consumers that there was no risk of losing money because the company would provide a "warranty" and would continue working with them and/or provide free services if the consumer was not satisfied.

67.     These earning claims were false because the overwhelming majority of consumers who purchased the Business Coaching Program did not earn substantial income and/or could not recoup the purchase program costs from future business income.  In fact, in most instances, consumers who purchased the Business Coaching Program were never able to establish an operating business.

## VIOLATIONS OF THE FTC ACT

68.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

69.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

70.     As set forth below, Defendants have engaged in violations of Section 5(a) of the FTC Act in connection with the telemarketing and sale of the Business Coaching Program.

### Count I
### Misrepresentations Regarding Earnings

71.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of the Business Coaching Program, Defendants have represented, directly or indirectly, expressly or by implication, that consumers who purchased and used the Business Coaching Program were likely to earn substantial income, such as several thousand dollars a month.

72.     In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 71 of this Complaint, consumers who purchased the Business Coaching Program did not earn substantial income, such as several thousand dollars a month, or any income at all.

73.     Defendants' representations as set forth in Paragraph 71 of this Complaint were false or misleading or were not substantiated at the time the representations were made.

74.     Therefore, Defendants' representations as set forth in Paragraph 71 of this Complaint were false and misleading and constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count II
## Misrepresentation Regarding Products and Services Provided

75.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of the Business Coaching Program, Defendants have represented, directly or indirectly, expressly or by implication, that the Business Coaching Program:

      a.     was only open to a select number of qualified participants; or

      b.     included specialized one-on-one expert training tailored to the consumers' specific needs or business, access to specialized market research to find profitable products they could sell on eBay or on their own ecommerce websites, specialized assistance to develop ecommerce websites that were highly ranked by search engines, and/or marketing techniques that would drive consumers to their ecommerce websites.

76.     In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 75 of this Complaint:

      a.     there were no qualifications for entry into the program other than the consumer's willingness to pay whatever fees were charged; and

      b.     Defendants did not provide the products and services they represented they would provide, including but not limited to: specialized one-on-one expert training tailored to the consumers' specific needs or business, access to

specialized market research to find profitable products to sell on eBay or on ecommerce websites, specialized assistance to develop ecommerce websites that were highly ranked by search engines, and marketing techniques that would drive customer traffic to the consumers' ecommerce websites.

77.     Therefore, Defendants' representations as set forth in Paragraph 75 of this Complaint were false and misleading and constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### Count III
### Misrepresentation Regarding Need for Financial Information

78.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of the Business Coaching Program, Defendants have represented, directly or indirectly, expressly or by implication, they needed consumers' financial information to determine whether consumers were qualified for a program and/or to develop a business plan for consumers to reach their financial goals.

79.     In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 78 of this Complaint, Defendants did not use consumers' financial information to determine whether consumers were qualified for a program and/or to develop a business plan for consumers to reach their financial goals. Instead, the Defendants used consumers' financial information to decide how much to charge them for the Business Coaching Program.

18

80.     Therefore, Defendants' representations as set forth in Paragraph 78 of this Complaint were false and misleading and constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE TELEMARKETING SALES RULE

81.     Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108, in 1994. The FTC adopted the original Telemarketing Sales Rule ("TSR") in 1995, extensively amended it in 2003, and amended certain sections thereafter.

82.     Defendants are "sellers" or "telemarketers" engaged in "telemarketing" as defined by the TSR, 16 C.F.R. § 310.2(dd), (ff), and (gg).

83.     Defendants' goods and services, including the Business Coaching Program, are "Investment Opportunit[ies]" as defined in the TSR, 16 C.F.R. § 310.2(s). The TSR defines an "Investment opportunity" as "anything, tangible or intangible, that is offered, offered for sale, sold, or traded based wholly or in part on representations, either express or implied, about past, present, or future income, profit, or appreciation." 16 C.F.R. § 310.2(s).

84.     The TSR prohibits sellers from "[m]isrepresenting, directly or by implication, in the sale of goods and services . . . [a]ny material aspect of an investment opportunity including, but not limited to, risk, liquidity, earnings potential, or profitability." 16 C.F.R. § 310.3(a)(2)(vi).

85.     The TSR prohibits sellers from "[m]isrepresenting, directly or by implication, in the sale of goods and services . . . [a]ny material aspect of the performance, efficacy, nature, or

central characteristics of goods or services that are the subject of a sales offer." 16 C.F.R. § 310.3(a)(2)(iii).

86.     The TSR prohibits sellers from "[m]aking a false or misleading statement to induce any person to pay for goods or services. . . ." 16 C.F.R. § 310.3(a)(4).

87.     Except as expressly permitted by the applicable credit card system, the TSR makes it a deceptive telemarketing act or practice for:

> a.     a merchant to present to or deposit into, or cause another to present to or deposit into, the credit card system for payment, a credit card sales draft generated by a telemarketing transaction that is not the result of a telemarketing credit card transaction between the cardholder and the merchant;
>
> b.     any person to employ, solicit, or otherwise cause a merchant, or an employee, representative, or agent of the merchant, to present to or deposit into the credit card system for payment, a credit card sales draft generated by a telemarketing transaction that is not the result of a telemarketing credit card transaction between the cardholder and the merchant; or
>
> c.     any person to obtain access to the credit card system through the use of a business relationship or an affiliation with a merchant, when such access is not authorized by the merchant agreement or the applicable credit card system.

16 C.F.R. § 310.3(c).

88.     Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an

unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the
FTC Act, 15 U.S.C. § 45(a).

## Count IV
### Misrepresentations of Material Aspects of an
### Investment Opportunity in Connection with Telemarketing

89.     In numerous instances, in connection with telemarketing offers to sell the
Business Coaching Program, Defendants have misrepresented, directly or indirectly, expressly or
by implication, material aspects of investment opportunities, including, but not limited to, the
risk, earnings potential, or profitability of the Business Coaching Program.

90.     Defendants' acts or practices, as described in Paragraph 89 above, are deceptive
telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.3(a)(2)(vi) and (a)(4).

## Count V
### Misrepresentations Regarding the
### Performance, Efficacy, Nature or Characteristics of Goods and Services

91.     In numerous instances, in connection with telemarketing offers to sell the
Business Coaching Program, Defendants have misrepresented, directly or indirectly, expressly or
by implication, material aspects of the performance, efficacy, nature, or central characteristics of
the Business Coaching Program, such as:

> a.     consumers who purchased the Business Coaching Program were likely to
> earn substantial income;
>
> b.     was only open to a select number of qualified participants; and
>
> c.     included specialized one-on-one expert training tailored to the consumers'
> specific needs or business, access to specialized market research to find profitable
> products they can sell on eBay or on their own ecommerce websites, specialized

21

assistance to develop ecommerce websites that were highly ranked by search

engines, and/or marketing techniques that would drive consumers to their

ecommerce websites.

92.     Defendants' acts or practices, as described in Paragraph 91 above, are deceptive

telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.3(a)(2)(iii) and (a)(4).

## Count VI
### Failure to Disclose – Identity, Purpose, Nature of Services

93.     In numerous instances, in connection with telemarketing offers to sell the

Business Coaching Program, Defendants, directly or indirectly, have failed to disclose promptly

and in a clear conspicuous manner to the person receiving the call: (a) the identity of the seller;

(b) that the purpose of the call is to sell services; and (c) the nature of those services.

94.     Therefore, the Defendants' acts or practices, as described in Paragraph 93 above,

are abusive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.4(d)(1), (2), and

(3).

## Count VII
### Credit Card Factoring

95.     In numerous instances and without the express permission of the applicable credit

card system, Defendants have:

a.      presented to or deposited into, or caused another to present to or deposit

into, the credit card system for payment, a credit card sales draft generated by a

telemarketing transaction that is not the result of a telemarketing credit card

transaction between the cardholder and the merchant;

b.      employed, solicited, or otherwise caused a merchant, or an employee,

22

representative, or agent of the merchant, to present to or deposit into the credit card system for payment, a credit card sales draft generated by a telemarketing transaction that is not the result of a telemarketing credit card transaction between the cardholder and the merchant; or

    c.      obtained access to the credit card system through the use of a business relationship or an affiliation with a merchant, when such access is not authorized by the merchant agreement or the applicable credit card system.

96.     Therefore, Defendants' acts or practices, as described in Paragraph 95 above, violate Section 310.3(c) of the TSR, 16 C.F.R. § 310.3(c).

## CONSUMER INJURY

97.     Consumers have suffered substantial injury as a result of Defendants' violations of the FTC Act and the TSR. In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

98.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC. The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, the disgorgement of ill-gotten monies, and prejudgment interest, to prevent and remedy any violation of any provision of law enforced by the FTC.

99.     Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), authorizes this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the TSR, including the rescission or reformation of contracts, the refund of money, the disgorgement of ill-gotten monies, and prejudgment interest.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff FTC, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), and the Court's own equitable powers, requests that the Court:

A.     Enter a permanent injunction to prevent future violations of the FTC Act and the TSR by Defendants;

B.     Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act and the TSR, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, the disgorgement of ill-gotten monies, and prejudgment interest; and

C.     Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Respectfully submitted,

DAVID C. SHONKA
Acting General Counsel

Dated: _June 6, 2017_

Darren H. Lubetzky
Savvas S. Diacosavvas
Karen Dahlberg
Federal Trade Commission
Northeast Region

24

One Bowling Green, Suite 318
New York, NY 10004
Tel: (212) 607-2829
Fax: (212) 607-2822
Email: dlubetzky@ftc.gov
Email: sdiacosavvas@ftc.gov
Email: kdahlberg@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION